# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DHILLON SINGH, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>HANCOCK NATURAL RESOURCES GROUP, INC., et al.,<br><br>　　　　Defendants. | Case No.: 1:15-cv-01435-LJO-JLT<br><br>FINDINGS AND RECOMMENDATIONS GRANTING DEFENDANT'S MOTION FOR TERMINATING SANCTIONS<br><br>(Doc. 47) |

In this action, the plaintiffs contend Goose Pond breached a contract to sell 2,470 acres of farmland that was, at the time, being used as an almond farm. (Doc. 29 at 4) Plaintiffs have failed to provide discovery as ordered by the Court and failed to comply with its order imposing monetary sanctions. For the following reasons, the Court finds the imposition of sanctions is appropriate, and recommends the motion for terminating sanctions be **GRANTED**.

**I.      Background**

In November 2017, Defendants filed a motion to compel discovery, seeking to compel the production of documents with the associated metadata, as well as supplemental responses to the requests for production and interrogatories. (Doc. 47) The Court granted the motion in part on December 29, 2016. (Doc. 62) In doing so, the Court noted the parties agreed "the defendants requested email communications in TIFF format with the corresponding metadata." (*Id.* at 3) Defendants identified inconsistencies in email communications, which appeared to show alterations

1

to the evidence, which were not addressed by Plaintiffs. (*Id.* at 4) Accordingly, the Court granted the motion to compel "any request for electronically held documents," and ordered Plaintiffs to "produce all emails and other documents sought by the defendants in the format demanded with the accompanying metadata from the native computer." (*Id.*) Further, the Court ordered Plaintiffs to produce responsive documents such as the Articles of Incorporation; "the Purchase and Sale Agreement of August 4, 2015 in the format demanded with the accompanying metadata from the native computer;" a legible copy of the summary of damages; and amended responses to several discovery requests. (*See, e.g.*, *id.* at 6, 7, 9) The Court determined the imposition of monetary sanctions was appropriate and ordered Plaintiffs to pay $4,800 to counsel for the defendants within ten days of the date of service. (*Id.* at 16)

On January 19, 2017, Defendant filed the motion now pending, asserting Plaintiffs failed to comply with the Court's order and requesting terminating sanctions. (Doc. 63) Defendant asserts that "the majority of Plaintiffs' supplemental responses indicate that they have no other responsive documents aside from what they already produced, 'despite what may have been testified to at Plaintiffs' [sic] deposition.'" (*Id.*, emphasis omitted) Defendant contends the failure to produce emails with metadata confirms that Plaintiff's produced "fraudulently altered key emails." (*Id.* at 12) Given the failures to comply with the Court's order, Defendant seeks the imposition of terminating sanctions, and the dismissal of Plaintiffs' claims with prejudice. (*Id.* at 25) In the alternative, Defendant requests evidentiary sanctions and instruction sanctions be imposed. (*Id.* at 29-30) Finally, Defendant requests monetary sanctions or the time expended "bringing this motion and attempting to uncover Plaintiffs' fraud on the Court and [Defendant]." (*Id.* at 33)

Plaintiffs filed their response on January 26, 2017, asserting that it "it became evident certain materials were incapable of being produced by the Plaintiffs, in hard-copy or by meta-data, despite their references in the Plaintiffs' Complaint." (Doc. 66 at 2) As a result, Plaintiffs offered "to strike the offending passages consistent with FRCP 37(b)(2)(A)(iii)." (*Id.*) In addition, Plaintiffs contend that "[p]ursuant to the Court's Order of December 29th, 2016, Plaintiffs provided supplemental responses to Defendant's Request for Productions and Interrogatories… to the Defendant on January 9th, 2017 per the parties' agreement." (*Id.* at 4) According to Plaintiffs, they "have gone above and

2

beyond in replying to these requests to the extent they are able." (*Id.* at 6) However, Plaintiffs acknowledge that they did not produce "certain materials" upon which they relied, despite the Court's order. (*Id.* at 7-8) Rather, Plaintiffs' counsel indicates he "shares in [Defendant's] frustration," and is willing to "strik[e] paragraphs or causes of action that cannot be supported by admissible evidence." (*Id.* at 8)

## II. Rule 37 Sanctions

Pursuant to the Federal Rules of Civil Procedure, if a party "fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b). "Just orders" may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for the purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceedings in whole or in part;

(vi) rending a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A). As the Ninth Circuit explained, "Federal Rule of Civil Procedure 37 authorizes the district court, in its discretion, to impose a wide range of sanctions when a party fails to comply with the rules of discovery or with court orders enforcing those rules." *Wyle v. R. J. Reynolds Indus., Inc.*, 709 F.2d 857, 589 (9th Cir. 1983) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)).

As noted, Defendant requests terminating sanctions for Plaintiff's failure to comply with the Court's order directing Plaintiffs to respond to discovery and pay monetary sanctions. (Doc. 63) The Ninth Circuit observed, "A terminating sanction, whether default judgment against a defendant or dismissal of a plaintiff's action, is very severe," and "[o]nly willfulness, bad faith, and fault justify terminating sanctions." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091,

3

1096 (9th Cir. 2007); *see also Computer Task Group, Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004) (stating that where "the drastic sanctions of dismissal or default are imposed, . . . the range of discretion is narrowed and the losing party's noncompliance must be due to willfulness, fault, or bad faith"). The Court is obligated to impose lesser sanctions than dismissal, if feasible. *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987); *United States v. Nat'l Medical Enterprises, Inc.*, 792 F.2d 906, 912 (9th Cir.1986) ("The district court abuses its discretion if it imposes a sanction of dismissal without first considering the impact of the sanction and the adequacy of less drastic sanctions.").

### III.   Discussion and Analysis

#### A.   Failure to comply with the Court's order

Finding Plaintiffs failed to timely and properly respond to Defendant's discovery requests and failed to provide adequate justification for the actions taken, the Court ordered Plaintiffs to pay $4,800 to counsel for the defendant within ten days of the date of service of the order. (Doc. 62 at 15-16)  In addition, the Court ordered the amended discovery responses to be provided within ten days. (*See generally* Doc. 62)  Therefore, Plaintiffs were required to pay the sanctions and produce the ordered discovery no later than January 8, 2017.

##### 1.   Monetary sanctions

Finding Plaintiffs failed to timely and properly respond to Defendant's discovery requests, and failed to provide adequate justification for the actions taken, the Court ordered Plaintiffs to pay $4,800 to counsel for the defendant within ten days of the date of service of the order. (Doc. 62 at 15-16)  Therefore, Plaintiffs were required to pay the sanctions no later than January 8, 2017.

Plaintiffs requested an extension from Defendants, and were told they had until January 13, 2017. (Doc. 63 at 10)  Defendant notes that counsel "was initially reluctant to grant the extension because Dhillon had testified in his deposition in December 2016 that he not only had $129,000 in his WestAmerica Bank account, but that he had millions of dollars available to him from various resources." (*Id.*, citations omitted)  As of the date of filling, Defendant's counsel had not received the money ordered. (*Id.*)  Plaintiffs paid the monetary sanctions owed on February 2, 2017 (Doc. 69 at 2, Dolce Decl. ¶ 4), 25 days after the deadline ordered by the Court.

2.     Discovery failures

a.     Metadata

Defendant asserts Plaintiffs failed to "produce[] a single document in compliance with the Court's Order, much less documents with any metadata." (Doc. 63 at 10)  Previously, the Court noted that Defendant "requested email communications in TIFF format with the corresponding metadata." (Doc. 62 at 3, citing Doc. 48 at 13)  In response, Plaintiff "produced some TIFF-formatted emails but only after they had been forwarded from the subject computer to the office of the former attorney for the plaintiffs," which resulted in the metadata "'pertain[ing] to the forwarded versions of the emails to Plaintiffs' counsel's paralegal, not the original emails between Plaintiffs and Hancock.'" (*Id.*, quoting Doc. 48 at 9) The Court noted:

> The defendants argue that the metadata from the native versions of the email is crucial because it appears that the plaintiffs have produced key emails that are changed when compared to the same emails directed to the recipient. (Doc. 48 at 9-10) The defendants assert that emails appear to have been "whited out from Plaintiffs' versions, and in other instances new and different text has been inserted into Plaintiff's versions." Id. at 10. In one example, the defendants direct the Court's attention to two versions of the same email (Compare 49-2 at 2 with 49-1 at 2). In the plaintiffs' copy, it states that Hancock's representative indicate (apparently, when discussing a document related to the sale) that "It's Acceptable." (Doc. 49-1 at 2; Doc. 49 at 4) The one produced by Hancock does not have this language. (Doc. 49-2 at 2; Doc. 49 at 4)
> In a second example, the exact same email sent at the exact same time to the exact same people shows additional content ["on crop and Closing Escrow"] on the plaintiff's copy (Doc. 49-4 at 2; Doc. 49 at 5) that is not included on the email received by Hancock (49-6 at 2; Doc. 49 at 5). A third example shows the same e-mail with the plaintiffs' version (Doc. 49-8 at 2; Doc. 49 at 6) having significantly different content than Hancock's copy. (Doc. 49-9 at 2; Doc. 49 at 6) Notably, Hancock produced all three of these emails with the associated metadata demonstrating, apparently, no alterations by Hancock. (Doc. 49 at 4-6)

(Doc. 62 at 3-4, footnote omitted)  The Court noted Plaintiff did not address the inconsistencies between the emails, and there was a "significant showing" that the metadata was important. (*Id*. at 4)  Thus, the Court granted the motion to compel "as to any request for electronically held documents," and ordered Plaintiffs to "produce all emails and other documents sought by the defendants in the format demanded with the accompanying metadata from the native computer." (*Id.*)

Defendant reports that Plaintiffs "failed to produce the documents with metadata, claiming without explanation that they are 'unable' to do so." (Doc. 63 at 7) Plaintiffs' supplemental discovery response indicated:

5

> Any and all requests for production involving corresponding metadata from a native computer, *whether in the custody and control of the Plaintiffs or elsewhere*, despite reasonable search and effort, and other than what's already been produced by the Plaintiffs, *cannot here now be produced* under the deadline set by the Court's order.

(Doc. 65-1 at 2, emphasis added)  Plaintiffs did not offer any reason why the metadata in their possession could not be produced, or why they were unable to comply with the Court's deadline. (*See id.*)  Opposing the motion for sanctions, Plaintiffs simply assert that it "it became evident certain materials were incapable of being produced by the Plaintiffs, in hard-copy or by meta-data, despite their references in the Plaintiffs' Complaint."  (Doc. 66 at 2)

However, as Defendant observes, Dhillon had access to the emails in August and October— when he forwarded emails to his attorney for production— and "he should have access now."  (Doc. 63 at 11)  There was no explanation why the metadata was "incapable" of being produced.  Indeed, at the hearing, Plaintiff's counsel clarified only that producing the metadata would not support Plaintiff's version of the altered emails.  Whether this is the case, it is off topic.  The Court ordered the plaintiff to produce the metadata; it did not require the production only if it supported a particular version of a particular event.  Moreover, despite taking this position, counsel admitted that he had not examined the metadata and could not state with certainty exactly what it revealed.[1]

Plaintiffs' counsel confirmed that his clients have possession of the computers but gave no explanation why the discovery requested was "incapable" of being produced.  To the contrary, he indicated that Plaintiffs *could* produce the computers from which the emails were sent—and objected, though agreed to submit to an order requiring Plaintiffs to produce the physical computers, though the electronic discovery previously ordered was not produced.

        b.      *Other documents not produced*

Previously, Defendant served an interrogatory asking Plaintiff to describe "the method or manner used to calculate the amount of [Dhillon's] damages claim, including, without limitation, any assumptions, conclusions, or methodology used in the calculation."  (*See* Doc. 62 at 14)  In response, Dhillon produced a one-page spreadsheet, but portions of the spreadsheet were "greyed out" and

---

[1] Given the examples of adulterated evidence discovered by the defendants, it was reasonable for the defendants to want to examine the metadata for the entirety of all documents sought to discover if there was evidence of other adulterated evidence.

illegible, which Plaintiffs acknowledged.  (*Id.*, citing Doc. 48 at 33-34)  In addition, the Court noted Plaintiff failed to "provide the documents related to the sale of the collateral properties or, for example, documents demonstrating the income they claim they received in the past as to the six properties."  (*Id.* at 9)  The Court observed, "though Dhillon may no longer have personal possession of these documents, he is obligated to obtain them from those, such as escrow companies, banks, financiers, accountants, etc., over whom he exercises control."  (*Id.*, citing Fed. R. Civ. P. 34(a)(1))  Therefore, the Court ordered Plaintiffs to "provide a legible copy of the spreadsheet within ten days," *as well as documents demonstrating the loss of income for each property was determined*.  (*Id.* at 9, 14, emphasis added)

Defendant also served a request for production of documents that reflected the financial condition of Kern Lerdo and its ability to perform the Purchase and Sale Agreement in August and September 2015.  (Doc. 62 at 10)  In response to the request, "Dhillon produced an "Annual Customer Statement of Randeep Dhillon for the Period of 05/31/2011 – 06/30/2015 which indicates an Ending Cash Balance: $45,503,672.48 and Total Account Equity: $45,504,915.22."  (*Id.*, quoting Doc. 48 at 25)  The Court found this document was "[c]learly… not responsive to the requests," because "[t]he fact that he had these assets months earlier does not demonstrate he had them on the operative dates."  (*Id.*)  Further, the plaintiff failed "to explain why he simply did not obtain a document from his financial institution demonstrating his financial capability on the dates requested."  (*Id.* at 10)  Therefore, the Court ordered Plaintiffs to "produce all responsive documents," and if Kern Lerdo did not have any evidence of its ability to complete the sale, then it was ordered to "amend its response to state this."  (*Id.* at 10-11)

In the supplemental discovery response, Plaintiffs reported they were "unable to locate any … [document] other than the summary already produced," and were "incapable of producing a more legible version" of the spreadsheet.  (Doc. 65-1 at 9, 10)  Thus, Plaintiffs failed to produce any documents demonstrating their financial ability in August and September 2015 to satisfy the Purchase and Sale Agreement.  (Doc. 63 at 7)  However, as Defendant observes, it is unclear how Plaintiffs can be incapable of producing a legible version of a spreadsheet *they* created.  Moreover, as Defendant reports, "Dhillon testified at deposition [in December] that he *could* produce documents regarding his

calculation of damages:

> Q: Okay. So did you do some calculations to come up with this [$28,410,327] number [on the spreadsheet]?
>
> A: **I have it already. I can produce to you later.**
>
> Q: You should have produced it already. But you're saying you have some written-down calculations of how you reached this number?
>
> A: Yes.
>
> \*\*\*
> Q: Now, with respect to this- all these documents, there's obviously -- with respect to this attachment you had in your interrogatories, there's - you mentioned appraisals. There's mort -- mortgage loans. There's sale -- There's sale documents, right, that would have been purchase and sale documents with your sell- your buyers?
>
> A: Yes.
>
> Q: And to my knowledge, none of that's been produced in this case. Do you still have those documents?
>
> A: They were produced to Barry [Jorgensen, Plaintiffs' former attorney]. No. Not to the— my other attorney previously in September 2015, **but I can get more copies**.
>
> Q: Well, I'm just telling you that they haven't been produced in this case, and they're seemingly related to your damages.

(Doc. 63 at 15, quoting Doc. 65-10 at 14-15, 24-25; Dhillon Depo. 526: 18-527:1, 536:18 - 537:11) (emphasis in original)

Despite Dhillon's testimony under oath that he had the spreadsheet and would be able to produce it to Defendants, and that he could "get more copies" of the financial documents, Plaintiffs now report they have no other responsive documents. Plaintiffs offer no explanation for why the spreadsheet could not be produced—or reproduced—and fail to explain why they were unable to obtain documents from a bank demonstrating their financial ability to complete the purchase of the farm. Plaintiffs also do not affirmatively state that the documents do not exist. (*See* Doc. 65-1) Consequently, Plaintiffs have failed to comply with the Court's order to produce the spreadsheet and financial documents supporting their damages calculation.

### c.  *Identification of documents and Bates numbers*

Previously, the Court ordered Plaintiffs to identify responsive documents by Bates number. (Doc. 62 at 5-7, 9, 11, 13) The Court observed that Plaintiffs asserted they had provided documents

8

responsive to several requests for production, but failed to specifically identify the documents. Accordingly, the Court ordered Plaintiffs to "identify by Bates number which documents they intend to respond to these requests." (*See, e.g. id.* at 6)

In the supplemental response, Plaintiffs asserted they were unable to comply with the Court's order because "[t]o the Plaintiffs' knowledge…, any and all responses since produced by Plaintiffs have not yet been identified with Bates number other than electronic metadata already produced and certain documents up to 0000000019." (Doc. 65-1 at 4)  On the other hand, as Defendants observe, "Plaintiffs could have and should have easily either referenced PDF page numbers from their prior productions, or alternatively, reproduced their prior productions with Bates numbers." (Doc. 63 at 19-20)  Because Plaintiffs failed to do so, Defendant remained unable to identify the purported responsive "documents 'previously identified and/ or produced.'" (*Id.* at 20)  The failure of Plaintiffs to identify the documents previously produced through Bates number or otherwise, smacks of gamesmanship and deliberate and willful refusal to comply, if not with the explicit order of the Court than, clearly, with its spirit and intent.

### 3. Falsified discovery

#### a. Bank records

Defendant contends that it "recently learned that the bank statements that Plaintiffs produced to GPA during the course of discovery in this case (the same statements that Plaintiffs had provided to Hancock as proof of funds in July 2015 during the bid process for the Almond Farm) were fraudulently altered." (Doc. 63 at 20, footnote omitted)  Defendant asserts:

> In their October 2016 document production, Plaintiffs produced two documents: (1) a document purporting to be Dhillon's "May 31, 20<u>11</u> to June 30, 20<u>15</u>." "Annual" [sic] ForEx account statement from GAIN Capital showing a total account equity of **$45,504,915.22** in Account No. xxxx5786, and (2) a document purporting to be an April 30, 2015 WestAmerica Bank account statement in the name of BealeBti Enterprises, Inc. (one of Dhillon's various companies) showing a balance of **$9,948,011.82**, both of which Plaintiffs produced to GPA during the course of discovery. (Exh. 3 at 2; Exh. 5 at 2.) In their discovery responses-most recently, in their January 16, 2017 further supplemental responses to RFPs Nos. 37- 42—Plaintiffs have repeatedly relied on those documents as evidence of their financial condition and ability to perform. (*See, e.g.,* Exh. 13 at 12-15.)

(*Id.* at 21, emphasis in original)  Dhillon testified at his deposition that the ForEx account statement was accurate. (Doc. 65-10 at 352:7-9)

However, in the course of discovery, Defendant "issued records subpoenas to both GAIN Capital and WestAmerica Bank in December 2016." (Doc. 63 at 21) Defendant reports:

> GAIN Capital's document production and the corresponding custodian of records declaration indicate that (1) Dhillon has **never** had an account with GAIN bearing Account No. xxxx57<u>8</u>6, and (2) that Dhillon's actual GAIN account (Account No. xxxx57<u>3</u>6, curiously only two digits different than the account number on the forged statement he produced to GPA) had a balance of **only $56.15** on June 30, 2015 (not $45,504,915.22 as his production reflects). (Exhs. 2, 4.) Similarly, WestAmerica Bank's document production indicates that BealeBti's WestAmerica account in fact had an **overdraft of $512.10** as of April 30, 2015 (not a $9,948,011.82 balance as Plaintiffs' production reflects). (Exh. 6 at 2.)

(*Id.*, emphasis in original) Indeed, Alex Bobinski, a custodian of records for GAIN Capital, reported under penalty of perjury that "GAIN Capital has no records of any Account Number [xxxx]5786 in the name of Randeep Dhillon, and that no such account has ever existed. (Doc. 65-2 at 2, Bobinksi Decl. ¶ 4) Further, the statement that GAIN Capital produced for the period of May 29 to June 30, 2015 shows a balance of $56.15. (Doc. 65-4 at 2) Likewise, Jessica Kalenik, a WestAmerica Bank representative, produced "copies of statements dated from 04/01/2015 through 09/30/2015," and the statement dated April 30, 2015 shows an overdraft of $512.00, while the statement produced by Plaintiffs shows a balance of $9,948,011.82. (*Compare* Doc. 65-6 at 3 *with* Doc. 65-5 at 2)

The statement produced by Plaintiff for WestAmerica Bank also contains a glaringly obvious evidence of alteration: the balance decreases from $7,129,457.17 on April 1, 2015 to only $30.63 on April 2, yet only shows a withdrawals totaling $70,751.46 on April 1 and $2,000.00 on April 2. (Doc. 65-5 at 2, 7) There is simply no plausible explanation for the balance change of more than $7,120,000 between the two dates in the document produced by Plaintiff. Then again, on April 3, the balance again increases by about $7 million despite no equivalent deposit.

In addition, the document curiously identifies the balance of "$7159,560.20"; "3104,471.04"; "3392,922.66"; and "9948,011.82"—with each of the numbers missing a comma to separate the millions from the thousands. This is inconsistent with other portions of the document, which have the commas in the proper places, such as the ending balance of $9,948,011.82.

In light of the evidence produced by GAIN Capital and WestAmerica Bank, as well as the obvious alterations in the document produced by Plaintiffs and the absolute refusal of Plaintiffs to explain, the Court finds the evidence overwhelmingly demonstrates that Plaintiffs produced falsified

10

bank documents, and testified falsely under oath regarding the authenticity.

### b.     Email alterations

As discussed above, Plaintiffs previously produced emails that appeared to have been altered, which is why the Court ordered Plaintiffs to produce the emails with metadata.  For example, an email "sent at the exact same time to the exact same people shows additional content ["on crop and Closing Escrow"] on the plaintiffs' version (Doc. 49-4 at 2; Doc. 49 at 5) that was not included on the email received by Hancock (49-6 at 2; Doc. 49 at 5).  A second email had significantly different content on Plaintiffs' version when compared to Hancock's version.  (Doc. 49-8 at 2; Doc. 49 at 6) Notably, Hancock produced each of these emails with the associated metadata demonstrating, apparently, no alterations by Hancock. (Doc. 49 at 4-6)  Further, Defendant deposed Plaintiffs' prior counsel and paralegal, who testified under oath that they did not alter the emails.  (Doc. 63 at 8; *see also* Doc. 65-11 at 5, Franchino Depo. 69: 7-21, 72:4-18, 75:24-77:8; Doc. 65-12 at 7)  The only conclusion the Court is left with is that *Plaintiffs* altered the emails prior to producing the documents to counsel.  Indeed, Plaintiffs' refusal to comply with the Court's order to produce the metadata for the emails—which would reveal the alterations—strongly suggests this is the correct conclusion.

## C.     Terminating Sanctions

"District courts have inherent power to control their dockets," and in exercising that power, a court may impose sanctions including dismissal of an action.  *Thompson v. Housing Authority of Los Angeles*, 782 F.2d 829, 831 (9th Cir. 1986). A court may dismiss an action with prejudice, based on a party's failure to obey a court order. *See, e.g. Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (dismissal for failure to comply with an order); *Malone v. U.S. Postal Service*, 833 F.2d 128, 130 (9th Cir. 1987) (dismissal for failure to comply with a court order).

The Court must consider the following factors in its evaluation of whether to impose a case-dispositive sanction pursuant to Rule 37(b): "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."  *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1096; *accord Computer Task Group*, 364 F.3d at 1115. The Ninth Circuit explained: "Where a court order is violated, the first two factors

support sanctions and the fourth factor cuts against a default. Therefore, it is the third and fifth factors that are decisive." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1412 (9th Cir. 1990).

### 1. Public interest and the Court's docket

In the case at hand, the public's interest in expeditiously resolving this litigation and the Court's interest in managing the docket weigh in favor of dismissal. *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 990 (9th Cir. 1999) ("The public's interest in expeditious resolution of litigation always favors dismissal"); *Ferdik*, 963 F.2d at 1261 (recognizing that district courts have inherent interest in managing their dockets without being subject to noncompliant litigants). Plaintiffs' failure to comply with their discovery obligations—even after being ordered by the Court—has consumed scare judicial time and resources. Accordingly, these factors support the imposition of sanctions.

### 2. Prejudice to Defendant

To determine whether Defendant has been prejudiced, the Court must "examine whether the plaintiff's actions impair the ... ability to go to trial or threaten to interfere with the rightful decision of the case." *Malone*, 833 F.2d at 131 (citing *Rubin v. Belo Broadcasting Corp.*, 769 F.2d 611, 618 (9th Cir. 1985)).

The Ninth Circuit has determined that a party's "[f]ailure to produce documents as ordered . . . is considered sufficient prejudice" supports the issuance of sanctions. *Adriana Int'l Corp.*, 913 F.2d at 1412 (citing *Securities & Exch. Comm'n. v. Seaboard Corp.*, 666 F.2d 414, 417 (9th Cir. 1982)); *see also Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (prejudice results when a party's refusal to provide documents forces the other party to rely on incomplete evidence at trial). In this case, as discussed above, Plaintiffs failed to comply with the Court's orders to produce emails with metadata, to produce responsive documents supporting the damage calculations, and to specifically identify any documents responsive to Defendants' requests for production. Therefore, this factor favors the imposition of sanctions.

### 3. Availability of less drastic sanctions

The Court "abuses its discretion if it imposes a sanction of dismissal without first considering the impact of the sanction and the adequacy of less drastic sanctions." *United States v. Nat'l Medical Enterprises, Inc.*, 792 F.2d 906, 912 (9th Cir. 1986). However, as the Ninth Circuit explained, "a

plaintiff can hardly be surprised" by a sanction of dismissal "in response to willful violation of a pretrial order." *Malone*, 833 F.2d at 133.

Significantly, the Court previously imposed monetary sanctions on Plaintiffs, who failed to comply with the deadline ordered by the Court and paid the sanctions more than twenty days later— only doing so after the motion for terminating sanctions was filed. Plaintiffs have demonstrated their willingness to ignore deadlines imposed by the Court, disrupt the course of the litigation, and prepare falsified documents to respond to discovery requests. Such actions demonstrate bad faith and Plaintiffs' willful abuse of the judicial process and support the issuance of terminating sanctions. *See Conn. Gen. Life Ins. Co.,* 482 F.3d at 1096 (explaining "discovery violations [that] threaten to interfere with the rightful decision of the case" support the imposition of terminating sanctions); *see also Professional Seminar Consultants v. Sino Am. Technology Exch. Co.*, 727 F.2d 1470, 1474 (9th Cir. 1983) (finding the district court did not err in issuing terminating sanctions where the party "willfully, deliberately, and intentionally submitted false documents").

On the other hand, Plaintiffs, through counsel, cleverly suggest the Court merely strike portions of the complaint that related to the offending actions. However, as counsel admitted at the hearing, even if these portions were stricken, the substance of the complaint remains because these portions are mere surplusages. This tactic offers no relief to the defendants and no sanction on the plaintiffs.

In addition, counsel's arguments made clear that when the case continues, Plaintiffs intend to "vary" their current positions. For example, no longer would they claim there was an executed written purchase agreement and, instead, they would claim there was an accepted oral contract. This would require the defendants to discard all of their discovery efforts and to begin anew, despite the financial burden this imposes. Again, Plaintiffs offer no explanation for why they should be permitted to take new and contrary factual and legal positions. Moreover, even if the Court permitted this tactic, Plaintiffs offer no assurances that the discovery provided by them this time will not be manufactured or that the deposition testimony given this time, would actually be truthful. Consequently, this factor support the imposition of terminating sanctions

///

### 4. Public policy

Given Plaintiffs' failure to comply with the Court's order, their willful discovery violations and their blatant falsification of evidence, the policy favoring disposition of cases on their merits is outweighed by the factors in favor of dismissal. *See Malone*, 833 F.2d at 133, n.2 (explaining that although "the public policy favoring disposition of cases on their merits . . . weighs against dismissal, it is not sufficient to outweigh the other four factors").

### D. Monetary Sanctions

Defendant seeks an award of monetary sanctions in addition to terminating sanctions. (Doc. 63 at 32) Rule 37 provides for an award of monetary sanctions: "The court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

However, in light of the terminating sanctions recommended, the Court finds the imposition of additional monetary sanctions unjust.[2] See Fed. R. Civ. P. 37(b)(2)(C); *see also Reddy v. Precyse Solutions LLC*, 2015 U.S. Dist. LEXIS 79352 (E.D. Cal. June 18, 2015) (finding the plaintiff willfully refused to comply with discovery orders and imposing terminating sanctions, but denying an "award for further monetary sanctions [as] unjust"); *Meador v. Macy's Corporate Servs.*, 2016 U.S. Dist. LEXIS 128163 (D. Haw. Aug. 26, 2016), *adopted by* 2016 U.S. Dist. LEXIS 127197 (D. Haw. Sept. 16, 2016) (finding "awarding monetary sanctions in addition to terminating sanctions would be unjust"); *Townsend v. Ihde*, 2015 U.S. Dist. LEXIS 1496 (D.Mon. Jan. 7, 2015) (declining a monetary award where dismissal sanctions were imposed).

### IV. Findings and Recommendations

As set forth above, Plaintiffs failed to comply with the Court's order granting in part Defendant's motion to compel discovery. In addition, the production of falsified documents demonstrates Plaintiffs' bad faith and willful abuse of the judicial process. Accordingly, the Court

---

[2] This does not preclude any defendant from seeking an award of fees and costs in subsequent motion practice. Indeed, had the Court not determined that terminating sanctions is appropriate, it would have imposed a significant monetary sanction. However, for the reasons set forth above, it is clear that imposing monetary sanctions will not correct the conduct that gave rise to this and the earlier motion.

finds the factors set forth above support the imposition of terminating sanctions, particularly the prejudice caused to Defendant and the unavailability of less drastic sanctions. *See Conn. Gen. Life Ins. Co.,* 482 F.3d at 1096' *Professional Seminar Consultants*, 727 F.2d at1474. Based upon the foregoing, the Court **RECOMMENDS**:

    1.    Defendants' request for terminating sanctions be **GRANTED**;

    2.    Defendants' request for monetary sanctions be **DENIED**; and

    3.    The action be **DISMISSED WITH PREJUDICE**.

These Findings and Recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within fourteen days of the date of service of these Findings and Recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991); *Wilkerson v. Wheeler*, 772 F.3d 834, 834 (9th Cir. 2014).

IT IS SO ORDERED.

    Dated:   **February 21, 2017**          **/s/ Jennifer L. Thurston**
                                                           UNITED STATES MAGISTRATE JUDGE